**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **JOHN L. HATCH,** | § | |
| **PLAINTIFF** | § | |
| | § | |
| *versus* | § | |
| | § | |
| **TURNER M. JONES,** | § | **CIVIL ACTION NO. 4:18-cv-4146** |
| **LAWRENCE KUYKENDALL,** | § | |
| **MELIDA RAMIREZ,** | § | |
| **NATIONWIDE COIN &** | § | |
| **BULLION RESERVE, INC.,** | § | |
| **DEFENDANTS** | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

Plaintiff John L. Hatch ("Hatch" or "Plaintiff") complains of the actions of Defendants Turner M. Jones ("Jones"), Melida Ramirez ("Ramirez"), Lawrence Kuykendall ("Kuykendall"), and Nationwide Coin & Bullion Reserve, Inc. ("NCBR") (together, "Defendants"), respectfully shows the following:

## NATURE OF THE CASE

**1.** This action is brought under 18 U.S.C. §§ 1961-1968 (Racketeer Influenced and Organized Crime Act and Texas common law by Plaintiff John L. Hatch ("Hatch") against Turner M. Jones (RICO Defendant), Melida Jones (RICO Defendant), and Lawrence Kuykendall (RICO Defendant) (collectively, "RICO Defendants") operating by and through Nationwide Coin & Bullion Reserve, Inc. (the "RICO Enterprise"), for their unlawful, false, misleading and unconscionable misrepresentations and sales tactics, that resulted in damages of $161.078.12, from the purchase coins that are not worth the value at which they were purchased and will never

1

attain the value as claimed or return on investment as represented.  Hatch seeks to rescind his purchase and/or recover actual damages, consequential damages, punitive damages, statutory treble damages, pre- and post-judgment interest, attorneys' fees, litigation expenses and costs of suit.

2.      Turner M. Jones (RICO Defendant) conducted and/or participated in concert with in the business and financial affairs of NCBR (RICO Enterprise) through a pattern of racketeering activity; to wit: Jones participated, directly and indirectly, with Melida Ramirez and Lawrence Kuykendall, and together they acted by and through various employees, representatives and entities, to engage in repeated and systematic mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341; 1343 that generated multiple and repeated fraudulent and unlawful coin sales to Hatch that, in turn, generated exorbitant compensation for the Jones.  In association with Melida Ramirez and Lawrence Kuykendall, Jones caused NCBR (RICO Enterprise) to use the interstate mails and wires to repeatedly make and/or send fraudulent coin solicitations, sales receipts and/or other purchase confirmations to Hatch.

3.      By his unlawful acts, Turner M. Jones (i) conducted and/or participated in the affairs of NCBR (in violation of 18 U.S.C. § 1962(c)) and/or (ii) conspired to violate 18 U.S.C. § 1962(b) and(c) (in violation of 18 U.S.C. §1962(d)), and defrauded Hatch in the process.  Turner M. Jones committed these substantive RICO offenses by causing NCBR to engage in multiple predicate acts of mail fraud and wire fraud—all the while knowing of, and agreeing to, the overall objective of such fraud; to wit: generating exorbitant compensation for himself and to the Jones.  Turner M. Jones knew that making and/or sending fraudulent solicitations, sales receipts and/or purchase confirmations to Hatch was fraudulent, misleading and unlawful.  Turner M. Jones knew such wrongful acts and practices would generate multiple and repeated unlawful

coin sales to Hatch that, in turn, would generate exorbitant compensation for him and his related Jones RICO Defendants.  Turner M. Jones engaged in the scheme to take unfair advantage of Hatch.  Turner M. Jones's wrongful acts proximately and/or directly caused Hatch to be substantially overcharged for the coins.

4.     Melida Ramirez (RICO Defendant) conducted and/or participated in the business and financial affairs of NCBR (the RICO enterprise) through a pattern of racketeering activity; to wit: Ramirez participated, directly and indirectly in association with Turner M. Jones and Lawrence Kuykendall, and acting by and through various employees, representatives and entities, to engage in repeated and systematic mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341; 1343 that generated multiple and repeated unlawful coin sales to Hatch that, in turn, generated exorbitant compensation for Ramirez. In association with Turner M. Jones and Lawrence Kuykendall, Ramirez caused NCBR (RICO Enterprise) to use the interstate mails and wires to repeatedly make and/or send fraudulent coins, sales receipts and/or other purchase confirmations to Hatch.

5.     By her unlawful acts, Melida Ramirez (i) conducted and/or participated in the affairs of NCBR (in violation of 18 U.S.C. § 1962(c)) and/or (ii) conspired to violate 18 U.S.C. § 1962(b) and (c) (in violation of 18 U.S.C. §1962(d)), and defrauded Hatch in the process.  Melida Ramirez committed these substantive RICO offenses by causing NCBR to engage in multiple predicate acts of mail fraud and wire fraud—all the while knowing of, and agreeing to, the overall objective of such fraud; to wit: generating exorbitant compensation for herself.  Melida Ramirez knew that making and/or sending fraudulent solicitations, sales receipts and/or purchase confirmations to Hatch was fraudulent, misleading and unlawful.  Melida Ramirez knew such wrongful acts and practices would generate multiple and repeated unlawful coin sales to Hatch

that, in turn, would generate exorbitant compensation for her.  Melida Ramirez engaged in the scheme to take unfair advantage of Hatch.  Melida Ramirez's wrongful acts proximately and/or directly caused Hatch to be substantially overcharged for the coins.

**6.**     Lawrence Kuykendall (RICO Defendant) conducted and/or participated in the business and financial affairs of NCBR (the RICO Enterprise) through a pattern of racketeering activity; to wit: Kuykendall participated, directly and indirectly in association with Turner M. Jones and Melida Ramirez, and acting by and through various employees, representatives and entities, to engage in repeated and systematic mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341; 1343 that generated multiple and repeated unlawful coin sales to Hatch that, in turn, generated exorbitant compensation for Kuykendall. In association with Turner M. Jones and Melida Ramirez, Lawrence Kuykendall caused NCBR (RICO Enterprise) to use the interstate mails and wires to repeatedly make and/or send fraudulent coins, sales receipts and/or other purchase confirmations to Hatch.

**7.**     By his unlawful acts, Lawrence Kuykendall (i) conducted and/or participated in the affairs of NCBR (in violation of 18 U.S.C. § 1962(c)) and/or (ii) conspired to violate 18 U.S.C. § 1962(b) and (c) (in violation of 18 U.S.C. §1962(d)), and defrauded Hatch in the process. Lawrence Kuykendall committed these substantive RICO offenses by causing NCBR to engage in multiple predicate acts of mail fraud and wire fraud—all the while knowing of, and agreeing to, the overall objective of such fraud; to wit: generating exorbitant compensation for himself. Lawrence Kuykendall knew that making and/or sending fraudulent solicitations, sales receipts and/or purchase confirmations to Hatch was fraudulent, misleading and unlawful.  Lawrence Kuykendall knew such wrongful acts and practices would generate multiple and repeated unlawful coin sales to Hatch that, in turn, would generate exorbitant compensation for himself.

Lawrence Kuykendall engaged in the scheme to take unfair advantage of Hatch.  Lawrence Kuykendall's wrongful acts proximately and/or directly caused Hatch to be substantially overcharged for the coins.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over John L. Hatch's claims pursuant to (i) 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000, exclusive of interest and costs, and the Parties are citizens of different states (diversity), and (ii) 28 U.S.C. § 1367 (supplemental jurisdiction).  This Court also has *in personam* jurisdiction over Defendants because at all relevant times, Defendants resided, maintained citizenship, were found, had agents, conducted business and/or sold the coins at issue in this case to Hatch in and/or from the Southern District of Texas.

9.     Venue is proper in the Southern District of Texas pursuant to 28 U.S.C § 1391(a) because, at all relevant times, Defendants resided, were found, had agents and/or conducted business in the Southern District of Texas.  Defendants sold the numismatic and bullion coins at issue in this case to John L. Hatch in and/or from the Southern District of Texas.  A substantial part—if not all—of Defendants' wrongful acts and omissions occurred in the Southern District of Texas.

## PARTIES

10.    **Plaintiff John L. Hatch** ("Hatch") is a citizen and resident of Jefferson, Oregon.

11.    **Defendant Turner M. Jones** ("Jones") is a citizen and resident of Houston, Harris County, Texas.  He may be served at his residence at 15758 Fleetwood Oaks Drive, Houston, Harris County, Texas.

**12.**     **Defendant Melida Ramirez** ("Ramirez") is a citizen and resident of Houston, Harris County, Texas.  She may be served at her residence at 15758 Fleetwood Oaks Drive, Houston, Harris County, Texas.

**13.**     **Defendant Lawrence P. Kuykendall** ("Kuykendall") is a citizen and resident of Missouri City, Fort Bend County, Texas.  He can be served at his residence at 4707 Wild Horse Court., Missouri City, Texas 77459.

**14.**     **Defendant Nationwide Coin & Bullion Reserve, Inc.** ("NCBR") is a private corporation organized under the State of Texas.  Its counsel, Mr. Todd Collins, 2777 Allen Parkway, Suite 1000, Houston, Texas 77019, (713) 615-6060, *tcollins@taylaw.com*, has agreed to waive service of the summon and complaint.

## FACTUAL BACKGROUND

**15.**     The Defendants operate a sales and telemarketing operation for the purpose of selling collectible numismatic, semi-numismatic, and bullion coins[1] directly to consumers over the telephone and via the internet.  Defendants themselves and through various employees make hundreds of intrastate and interstate sales calls per month — via the telephone — and ship these coins by the interstate mails and private interstate delivery services.  Many times, these Defendants utilize one or more of the following unlawful, false, misleading and unconscionable sales tactics:

    (i)    Misrepresenting attributes of graded bullion ("certified coins") to move customers from bullion to the over-price coins;

---

[1] The term "*numismatic*" refers to collectible coins whose value is based upon qualities other than the metal content of the coin, such as appearance, population, grade, rarity, and other attributes.  "*Semi-numismatic*" refers to coins whose value partially derives from their numismatic value and partially from the value of the precious metal content.  *Bullion* coins derive their value almost entirely from the fair market value of the precious metal content.

(ii) misrepresenting qualities of the coins with promises that the investment in certified coins will substantially appreciate, all the while increasing the population of "certified coins" with sales to others;

(iii) offering a short term "money back guarantee" which provides no real opportunity to investigate the true value of the coins;

(iv) advising customers to purchase unique bullion coins, when the coins are not unique;

(v) misrepresenting to customers that "certified coins" will outperform other types of investments—without any specific underlying data supporting such assertions;

(vi) Using grading and marketing to deceptively sell bullion as some type of "modern numismatics," even though there are very large populations of the high-grade coins and/or the "certification" is commonly duplicated with minor expense;

(vii) misrepresenting the market value of "certified coins" in the customer portal to prevent or delay consumers from determining the actual market price of bullion coins.

(viii) Claiming a volatile market based upon the spot price of gold yet selling bullion coins at such exorbitant and fraudulent prices to make "market price" nothing but a gimmick;

(ix) Failing to display, disclose, or file required information regarding telephone solicitations; and,

(x) various other acts and practices that may be uncovered during discovery.

16. Defendants mislead Hatch and enticed him into believing the "certified coins" were a sound investment, that he was getting "good deals," would retain their value, and that the coins were unique and/or rare. Defendants failed to advise Hatch that he was paying substantially more than the fair market price of "certified" coins and incurring immediate and substantial losses with each transaction:

(a) On February 17, 2018, Hatch received an unsolicited phone call from Defendants' representative who convinced Hatch to purchase four (4) 2018 $10 Gold American Eagle ("GAE") ASG FS bullion coins, all of grade MF70[2] for $3,580.00 (or $895.00 each) as a

---

[2] The coin's grade is a numerical value, commonly referred to as the *Sheldon scale* that ranges between 1 and 70. The most valuable coins are uncirculated coins, commonly referred to as mint state (MS) and designated with grades from 60 to 70. Thus, a coin with a grade MS-70 is a perfect coin in original, uncirculated condition. PF-70 is a reference to "Proof 70", is another term to signify the coin has flawless characteristics but that the mint

sound and safe investment.  In reality, the fair market value of the coins was only $1,750.58, resulting in an immediate and unconscionable loss to Hatch of over $1,829.42.  The mark-up on the coins was 105%, while the customary industry standard markup is less than 10%.  Today, the coins still have not obtained the value as represented and will never reached a level of return of investment as represented by Defendants in Plaintiff's lifetime;

(b)  On February 21, 2018, Defendants' representative convinced Hatch to purchase a 2018 GAE 4-coin sets ($5, $10, $25, $50) MS 70 for $12,795.00.  To entice him further, they gave Hatch a GAE common date that Defendants claim was worth $2,000.00.  The 4-coins set was marketed as sound and safe investments when, in reality, the fair market value of the 4-coin set was coins was $3,195.00.  This resulted in an immediate and unconscionable loss to Hatch of $9,600.00, and even with the phantom credit of the common date GAE, Hatch's loss is still over $8,000.00.  The mark-up on the 4-coin set was 300%, when the industry standard markup is less than 10%.  Today, the coins still have not obtained the value as represented and will never reached a level of return of investment as represented by Defendants.  In fact, Hatch will have to triple his money before any gain is realized.

(c)  On June 26, 2018, Defendants' representative convinced Hatch to purchase a 2005 Platinum American Eagle PF70 4-coin set ($10, $25, $50, $100) for $13,000.00 as a sound and safe investment.  In reality, the fair market value of the coins was approximately $2,942.00, which reflects mark-up of 342%, more than acceptable industry mark-up.  The Plaintiff incurred an unconscionable, immediate loss of $10,058.00.  Today, the coins still have not obtained the value as represented and will be years, if ever, to reached a level of return of investment as represented by Defendants.

(d)  On June 28, 2018, Hatch was convinced by Defendants' representatives to purchase a 12-coin set of $100 Platinum American Eagles PF70 for $55,000.00.  The actual fair market

---

was intended for collectors. It is not a higher grade than MS-70 (Mint State 70), which is the highest grade for general circulation. The numerical grade is assigned based on a number of attributes, such as luster (i.e. shininess), strike (i.e. how well the mint connected with the blank coin in manufacturing), and color (i.e. the dye variations used in striking the coin). The grades are assigned for a nominal fee by independent grading services. The premier professional grading services are Numismatic Guaranty Corporation (NGC) and Professional Coin Grading Services (PCGS).

value of the 12-coin set was $22,400.00, resulting in an immediate and unconscionable monetary loss to Hatch of $32,600.00.  The mark-up was 146%, as contrasted with the acceptable industry mark-up. Today, the coins still have not obtained the value as represented and will never reached a level of return of investment as represented by Defendants. These coins will have to more than double in value for Hatch to realize a "break even" point.  He will never realize any gains in his "safe" investment, but only losses.

(e)   On June 28, 2018, Hatch was convinced by Defendants' representatives to purchase an additional 9-coin set of $100 Platinum American Eagles PF70 for $45,000.00.  The actual fair market value of the 12-coin set was $12,228.00, resulting in an immediate and unconscionable monetary loss to Hatch of $32,772.00.  The mark-up was 268%, as contrasted with the acceptable industry mark-up. Today, the coins still have not obtained the value as represented and will never reached a level of return of investment as represented by Defendants.

(f)   On Marcy 7, 2018, Hatch was convinced by Defendants' representatives to purchase three coins with prices that were clearly fraudulent:

(1)     An 1893 Gold Liberty 4-Coin Set ($2.5, $5, $10, $20) MS63 for $16,995.00, with an actual fair market value at the date of sale of only $3,200.00; resulting in an unconscionable immediate loss of $13,795.00.  The mark-up was 431% and Hatch will have to earn more than 4 times the value just to break even.

(2)     An 1897 Gold Liberty 4-Coin Set ($2.5, $5, $10, $20) MS63 for $14,995.00, with an actual fair market value at the date of sale of only $3,200.00; resulting in an unconscionable immediate loss of $11,795.00.  The mark-up was 369% and Hatch will have to earn 4 times the value just to break even.

(3)     An 1899 Gold Liberty 4-Coin Set ($2.5, $5, $10, $20) MS63 for $19,995.00, with an actual fair market value at the date of sale of only $3,200.00; resulting in an unconscionable immediate loss of $17,795.00.  The mark-up was 525% and Hatch will have to more than 4 times the value just to break even.

**(g)** On March 26, 2018, Hatch was convinced by Defendants' representatives to purchase an 1857-S $20 Liberty Double Eagle-Spiked Shield (SS Central America recovered coin) MS64 for $31,500.00.   The actual fair market value at the time of purchase was $6,900.00, which resulted in an immediate loss to Plaintiff of $24,600.00.  The mark-up was 357% which is unconscionable and fraudulent.

**(h)** On May 7, 2018, Hatch was convinced by Defendants' representatives to purchase eight 2017 $25 Palladium American Eagle MS69 First Strike MOY for a total of $8,496.00. Those coins have an actual fair market value at date of purchase of a total of $1,262.30. This resulted in an immediate and unconscionable loss to Hatch of $7,233.70.  The mark-up on the 8 coins was 573%, when the industry standard markup is less than 10%. Today, the coins still have not obtained the value as represented and will never reached a level of return of investment as represented by Defendants.  In fact, Hatch will have to earn an outstanding 600% return before any gain is realized.

**(c)** Hatch purchases of the coins from Nationwide Coin & Bullion Reserve, Inc. for Three Hundred Sixty-Six Thousand, Two Hundred Eight and 10/100 ($366,208.10).  However, it was subsequently learned that the coins had a fair market value for the coins, at the time of sale, of One Hundred Sixty-Three Thousand Four Hundred Three and 30/100 Dollars ($163,403.30). A summary of the above transactions reveals the following:

| Date | Invoice | Coin | Total Price | FMV | % 0ver FMV | Immediate Loss |
|---|---|---|---|---|---|---|
| 2/17/2018 | 173293 | 2018 $10 GAE ASG FS- MS70 | $3,580.00 | $1,750.58 | 105% | $1,829.42 |
| 2/21/2018 | 173391 | 2018 GAE 4 Coin Set ($5, $10, $25, $50) 1st Day Issue MS70 | $12,795.00 | $3,195.00 | 300% | $9,600.00 |
| 2/26/2018 | 173456 | 2005 PtAE PRF70 ($10, $25, $50, $100) | $13,000.00 | $2,942.00 | 342% | $10,058.00 |
| 2/28/2018 | 173610 | 2009-2017 $100 PtAE Sets - PF70 | $45,000.00 | $12,228.00 | 268% | $32,772.00 |
| 2/28/2018 | 173609 | 1997-2008 $100 PtAE Sets - PF70 | $55,000.00 | $22,400.00 | 146% | $32,600.00 |
| 3/7/2018 | 173840 | 1893 Gold Liberty Four Coin Set - MS63 ($2.5, $5, $10, $20) | $16,995.00 | $3,200.00 | 431% | $13,795.00 |
| 3/7/2018 | 173840 | 1897 Gold Liberty Four Coin Set - MS63 ($2.5, $5, $10, $20) | $14,995.00 | $3,200.00 | 369% | $11,795.00 |
| 3/7/2018 | 173840 | 1899 Gold Liberty Four Coin Set - MS63 ($2.5, $5, $10, $20) | $19,995.00 | $3,200.00 | 525% | $16,795.00 |
| 3/26/2018 | 174617 | 1857-S $20 Liberty Double Eagle-Spiked Shield MS64 (SS Central America) | $31,500.00 | $6,900.00 | 357% | $24,600.00 |
| 5/7/2018 | 173546 | 2017 $25 PalAE MS69 - First Strike MOY | $8,496.00 | $1,262.30 | 573% | $7,233.70 |
| | | | **$221,356.00** | **$60,277.88** | | **$161,078.12** |

Thus, John L. Hatch sustained an economic loss of One Hundred Sixty-One Thousand, Seventy-Eight and 12/100 Dollars ($161,078.12) at the instant he purchased the coins from Nationwide Coin & Bullion Reserve, Inc.  Not only was his investment not safe, it was nothing more than a fraudulent transaction to take advantage of the Plaintiff's age and detrimental reliance on misrepresentations.  In fact, Defendants reveal the intent to deceive Hatch, as they attempted to have Hatch waive any rights to recover damages.  Such attempt to defeat a claim by Hatch is in violation of Texas public policy and void as a matter of law under § 17.42, Tex. Bus. & Comm. Code.

17.     Once Defendants convinced Hatch to purchase the above-listed coins using the interstate wires, Hatch used the interstate wires and/or postal service to transfer funds directly to NCBR to pay for the coins.  The Defendants then sent the fraudulently misrepresented coins, along with sales receipts, to Hatch in Oregon via the interstate mails or private interstate carriers.  Thus, for each coin purchase, Hatch received a sales receipt from the Defendants "after the fact;" meaning, after—not before—he paid for each coin purchase, he received a sales receipt from Defendants listing the coins he purchased.   Plaintiff utilized interstate phone and wire services to confirm the transactions on the coin purchases listed above. The Defendants routinely used the United States Postal Service and other interstate delivery services to deliver the coins and consummate the fraudulent activity.

18.     In July 2018, Hatch was "cold-called" by another precious metals company.  Hatch indicated that he had already invested in precious metals but was willing to listen to this new company to determine if he needed to make any adjustments to his investments.  After a review of the gold purchases from NCBR, Hatch was informed that he had significantly overpaid for the

gold.  Subsequently, he attempted to have NCBR buy-back some of the coins and learned that his coins were not as valuable as originally represented.

19.    An appraisal performed by a professional numismatist reveals that Hatch had significantly overpaid for the coins and that he would never realize a return on investment as represented by the Defendants.  In fact, Hatch incurred an immediate loss of One Hundred Sixty-One Thousand, Seventy-Eight and 12/100 Dollars ($161,078.12) and may never recover his initial investment, much less realize any profit. The above-listed coins were not worth the prices Hatch paid for them when they were purchased, and they have not attained such value to date nor provided the safe haven or return on investment as promised by Defendants.

20.    Defendants and their employees utilized unlawful, false, misleading and unconscionable high-pressure sales tactics to convince Hatch to purchase the grossly overvalued coins by, *inter alia*, knowingly, intentionally and falsely representing:

   **(a)**   the current value of the coins with full knowledge that the coins were not worth the value at which they were purchased and will never provide the return of investment as represented;

   **(b)**   Failing to disclose that the fair market value of the "certified coins" was substantially less than the amount paid;

   **(c)**   Misleading Hatch into believing that Defendants wanted to assist him in making sound investments;

   **(d)**   Misleading Hatch as to the performance of "certified" bullion coins; and,

   **(e)**   Performing other acts of deception and misrepresentation that may be discovered during the course of this litigation.

21.    The sales of over-priced coins to Hatch are neither isolated nor unique to Hatch.  These defendants have sold over-priced coins to hundreds of other consumers over numerous years, indicating a continuing open-ended scheme and pattern of fraudulent conduct.  Such individuals

live in other states where defendants used the interstate mail and wires to perpetrate these frauds upon these other customers as part of the routine course of NCBR (RICO enterprise) business. Upon information and belief, many of those victims are under settlement agreements with these defendants that prevent them from being identified.

22.     As a direct and/or proximate result of Defendants' above wrongful acts and practices, Hatch has suffered (and continues to suffer) substantial economic damages, which Defendants refuse to remedy.  This case has resulted.

### CLAIMS FOR RELIEF/CAUSES OF ACTION

### COUNT I
### MAIL FRAUD AND WIRE FRAUD
### A Pattern of Unlawful Activity Under 18 U.S.C. § 1961, *Et Seq.*
### (as against RICO Defendants JONES, RAMIREZ, and KUYKENDALL)

23.     The preceding factual statements and allegations are incorporated by reference.

24.     By engaging in the above-described open-ended scheme to defraud Hatch—that also was a consistent, regular and dominant part of the manner in which the RICO Defendants Turner M. Jones ("Jones"), Melida Ramirez ("Ramirez"), Lawrence Kuykendall ("Kuykendall") participated in and conducted the day-to-day business affairs of the RICO Enterprise — these Defendants instigated, perpetrated and executed a scheme to defraud Hatch; to wit, the RICO Defendants (Jones, Kuykendall, Ramirez), individually or in concert, and by or through representatives and employees of the RICO Enterprise (Nationwide Coin & Bullion Reserve, Inc.), engaged in repeated and systematic mail fraud and wire fraud (as described above) in violation of 18 U.S.C. §§ 1341; 1343 that generated multiple and repeated unlawful coin sales to Hatch (as described above) that, in turn, generated exorbitant compensation for them.  RICO Defendants caused NCBR (RICO Enterprise), to use the interstate mails and wires to repeatedly

make and/or send fraudulent solicitations, sales receipts and/or purchase confirmations to Hatch for the above-described coin transactions.  As such, the RICO Defendants conducted and/or participated in the business and financial affairs of the RICO Enterprise through a pattern of racketeering activity (to wit, repeated and systematic mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341; 1343) (as described above) that generated multiple and repeated unlawful coin sales to Hatch that, in turn, generated exorbitant compensation for them.  RICO Defendants committed these substantive RICO offenses, all the while knowing about, and agreeing to, the overall objective of the fraud—generating exorbitant compensation for themselves. By their unlawful actions, therefore, they (i) conducted and/or participated in the affairs of NCBR (in violation of 18 U.S.C. § 1962(c)) and/or (ii) conspired with others (the identities of whom are only known by them at this stage in the litigation) to violate 18 U.S.C. § 1962(b); (c) (in violation of 18 U.S.C. §1962(d)), and defrauded Hatch (and possibly other customers) in the process.

25.     The RICO Defendants caused the RICO Enterprise to engage in this fraudulent scheme with the intent, *inter alia*, to (i) shift the burden of proof to Hatch knowing he does not have unlimited resources and has limited knowledge, and (ii) generate exorbitant compensation for themselves. The RICO Defendants' wrongful actions and fraudulent scheme constitute mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341; 1343.

26.     The multiple, repeated and continuous acts of mail fraud and/or wire fraud described in Paragraphs 15 and 16 (above) constitute a pattern of unlawful activity under 18 U.S.C. § 1961(1); (5).  Nothing about the RICO Defendants' schemes to defraud Hatch indicated that the schemes would ever terminate.  Moreover, and independent of the duration of the scheme, their wrongful acts were a consistent, regular and dominant part of the manner in which they

14

participated in, conducted the day-to-day business and financial affairs of the RICO Enterprise, NCBR.

## COUNT II
## VIOLATION OF 18 U.S.C. § 1962(c)
**(As Against as against RICO Defendants JONES,
RAMIREZ, KUYKENDALL, NCSLLP, WPLLC, FHLLC, ATHI, HUTFLP, and JMBIH)**

27.   The preceding factual statements and allegations are incorporated by reference.

28.   NCBR (operating under assumed name "Nationwide Coin & Bullion Reserve, Inc.") is an "enterprise" engaged in, and the activities of which affected, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4); 1962(c); 1962(d).

29.   Turner M. Jones ("Jones"), Melida Ramirez ("Ramirez"), and Lawrence Kuykendall ("Kuykendall) are "persons" within the meaning of 18 U.S.C. §§ 1961(3); 1962(c); 1962(d).

30.   Turner M. Jones, Melida Ramirez, and Lawrence Kuykendall conducted and/or participated in the business and financial affairs of NCBR (RICO Enterprise) through patterns of unlawful activity within the meaning of 18 U.S.C. §§ 1961(1)(B); 1961(5); 1962(c); to wit, the multiple, repeated and continuous acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 2; 1341; 1343, set forth above.

31.   The patterns of unlawful activity and corresponding violations of 18 U.S.C. § 1962(c) (*see* Paragraphs 15 and 16, above) by Turner M. Jones, Melida Ramirez, and Lawrence Kuykendall proximately and/or directly caused Hatch to suffer injury to his business and/or property within the meaning of 18 U.S.C. § 1964(c); to wit, Hatch was damaged by, *inter alia*, the fraudulent and inflated prices he paid for the above-listed coins, consequential damages related to the funds he borrowed to purchase the coins, and the corresponding mental anguish he

suffers.    Turner M. Jones, Melida Ramirez, and Lawrence Kuykendall committed these substantive RICO offenses by using NCBR to engage in multiple predicate acts of mail fraud and wire fraud, all the while knowing about, and agreeing to, the overall objective of the mail fraud—generating exorbitant compensation for themselves.   They knew their tactics and marketing practices were misleading and unlawful and would cause Hatch to suffer damages that were reasonably foreseeable by them and/or anticipated as a substantial factor and a natural consequence of their pattern of unlawful activity.

**COUNT III**
**VIOLATION OF 18 U.S.C. § 1962(d) BY**
**CONSPIRACY TO VIOLATE 18 U.S.C. § 1962(c)**
**(As Against as against RICO Defendants JONES, RAMIREZ, and**
**KUYKENDALL)**

**32.**    The preceding factual statements and allegations are incorporated by reference.

**33.**    Nationwide Coin & Bullion Reserve, Inc. is the "enterprise" that was engaged in, and the activities of which affected, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4); 1962(c); 1962(d).

**34.**    Turner M. Jones ("Jones"), Melida Ramirez ("Ramirez"), and Lawrence Kuykendall ("Kuykendall") are "persons" within the meaning of 18 U.S.C. §§ 1961(3); 1962(c); 1962(d).

**35.**    Turner M. Jones ("Jones"), Melida Ramirez ("Ramirez"), and Lawrence Kuykendall ("Kuykendall") conspired with other persons (the identities of whom are only known by them at this stage in the litigation) within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c); that is, they conspired to conduct and/or participate in the business and financial affairs of NCBR (the RICO Enterprise) through a pattern of unlawful activity within the meaning of 18

U.S.C. §§ 1961(1)(c); 1961(5); and 1962(c); to wit, the multiple, repeated and continuous acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 2; 1341; 1343, set forth above.

36.     RICO Defendants' pattern of unlawful activity and corresponding violations of 18 U.S.C. § 1962(d) proximately and/or directly caused Hatch to suffer injury to his business and/or property within the meaning of 18 U.S.C. § 1964(c); to wit, Hatch was damaged by, *inter alia,* the fraudulent and inflated prices he paid for the above-listed coins.  The RICO Defendants, through their representatives (including, but not limited to, , agreed to commit these substantive RICO offenses by using the RICO Enterprise (NCBR) to engage in multiple predicate acts of mail fraud and wire fraud, all the while knowing about, and agreeing to, the overall objective of the mail fraud—generating exorbitant compensation for themselves. They knew their tactics and marketing practices were misleading and unlawful and would cause Hatch to suffer damages that were reasonably foreseeable by them and/or anticipated as a substantial factor and a natural consequence of their patterns of unlawful activity.

**COUNT IV**
**<u>FRAUD AND/OR FRAUDULENT CONCEALMENT</u>**

37.     The preceding factual statements and allegations are incorporated herein by reference.

38.     In order to sell the overvalued coins to Hatch, Defendants utilized one or more of the above unlawful, false, misleading and unconscionable high-pressure sales tactics typical of the precious metals/coins/bullion direct sales industry.  Specifically, Defendants and their employees falsely and/or misleadingly represented to Hatch that he was a preferred customer, Hatch "needed the coins," Hatch was "getting a good deal," and Hatch "would not lose any money" on the purchases.  Defendants and their employees also falsely represented the current value of the

coins with full knowledge that the coins were not worth the value at which they were purchased nor will the coins attain the return of investment as promised.

39.     Defendants, by and through their salesmen, made the above false representations to Hatch with the intent that he relies upon them and with full knowledge that such representations were false when made.  Hatch relied on Defendants' material and false representations when deciding to purchase the grossly overvalued coins which, in fact, he purchased to his financial detriment and Defendants' financial gain.  As a direct and/or proximate result of Defendants' false and misleading representations about the overvalued coins, Hatch suffered (and continue to suffer) damages in the form of, *inter alia,* the amounts paid to Defendants for the gold coins in excess of their value, consequential damages related to the funds he borrowed to purchase the coins and mental anguish damages.

40.     By virtue of the confidential business relationship between Plaintiff and Defendants, Defendants had a duty to disclose the above concealed material facts to Plaintiff.  Their deliberate silence, when they had a duty to speak, and the resulting nondisclosure of the above concealed material facts, is the equivalent of false representations and/or omissions.  Such false representations and/or omissions were made knowingly and intentionally or, at the very least, in reckless disregard of Plaintiff's rights and interests.

41.     Plaintiff justifiably relied on Defendants' false representations and/or omissions to his financial detriment by purchasing the grossly overvalued coins.  Defendants' wrongful actions constitute fraud at Texas common law.

42.     Defendants concealed their wrongful actions with the intent to mislead and defraud Plaintiff.  Plaintiff was not aware of, nor, through the exercise of due diligence, could have become aware of Defendants' wrongful actions until such wrongful actions brought to light by

third parties.  Due to the Parties' confidential business relationships, which were predicated on their mutual trust and confidence, and Defendants' superior knowledge and/or means of knowledge, Defendants had a duty to disclose to Plaintiff the above materially false information. Defendants' failure to do so constitutes fraudulent concealment at Texas common law.

### COUNT V

### NEGLIGENT MISREPRESENTATION

43.     The preceding factual statements and allegations are incorporated herein by reference.

44.     Defendants made certain representations to Plaintiff in the course of their business and in transactions in which Defendants had a substantial monetary interest.  Defendants also supplied false information for the specific purpose of guiding Plaintiff in his purchase of the grossly overvalued coins.

45.     Defendants, however, failed to exercise reasonable care and competence in obtaining and communicating such information to Plaintiff by, *inter alia,* utilizing one or more of the above unlawful, false, misleading and unconscionable sales tactics typical of the precious metals/coins/bullion direct sales industry and/or making the above false and material misrepresentations and omissions.

46.     Hatch justifiably relied on Defendants' negligent misrepresentations when purchasing the grossly overvalued coins, which directly and/or proximately caused him to suffer damages to the financial benefit of Defendants. Hatch continued to justifiably rely upon Defendants' negligent misrepresentations in the customer "portal" regarding the grossly overvalued coins, which directly and/or proximately caused him to suffer damages to the financial benefit of Defendants. Defendants' wrongful conduct constitutes negligent misrepresentation at Texas common law.

## COUNT VI

### NEGLIGENCE

**47.**     The preceding factual statements and allegations are incorporated herein by reference.

**48.**     Defendants negligently valued, promoted, marketed, advertised and sold grossly overvalued coins to Plaintiff.  In doing so, Defendants owed a duty to Plaintiff to exercise reasonable care in valuing, promoting, marketing, advertising and selling the coins. Defendants breached their duty to Plaintiff by failing to exercise reasonable care in valuing, promoting, marketing, advertising and selling the coins to Plaintiff. Defendants' wrongful conduct directly and/or proximately caused Hatch to suffer damages.  Defendants' wrongful conduct constitutes negligence at Texas common law.

## COUNT VII

### VIOLATIONS OF THE TEXAS DECEPTIVE
### TRADE PRACTICES-CONSUMER PROTECTION ACT

**49.**     The preceding factual statements and allegations are incorporated herein by reference.

**50.**     Plaintiff is a "consumer" under the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"), pursuant to Section 17.45(4) of the Texas Business and Commerce Code.  Defendants are "persons" that may be sued under the DTPA, pursuant to Section 17.45(3) of the Texas Business and Commerce Code.

**51.**     By their above wrongful acts and/or misrepresentations, Defendants engaged in false, misleading and deceptive acts and practices in violation of Sections 17.50(a)(1) and 17.46(b) of the Texas Business and Commerce Code to wit, Defendants, *inter alia:* (i) represented that the coins have value that they do not have and that significant investor and collector demand exists for the coins that will cause them to appreciate in value, which does not exist and will not happen

20

(Section 17.46(b)(5)); (ii) represented that the coins are rare and/or unique and have substantial desire to investors and collectors, which will cause the coins to appreciate significantly in the future, which they are not (Section 17.46(b)(7)); and, (iii) failed to disclose the above information about the coins, which Defendants knew at the time of the transactions, with the intent to induce Plaintiff to purchase the coins that Plaintiff would not have purchased had Defendants disclosed such information (Section 17.46(b)(24)). Plaintiff relied on Defendants' above misrepresentations and omissions in purchasing the coins to his financial detriment.

52.     By their above wrongful acts and/or misrepresentations, Defendants also violated Section 17.50(a)(2) of the Texas Business and Commerce Code by breaching the implied and/or express warranties they made to Plaintiff that the coins have value and that significant investor and collector demand exists for the coins that will cause them to appreciate significantly in value.

53.     By their above wrongful acts and/or misrepresentations, Defendants also violated Section 17.50(a)(3) of the Texas Business and Commerce Code by engaging in unconscionable actions and/or an unconscionable course of action because such wrongful acts and practices took advantage of Plaintiff's lack of knowledge, ability, experience and/or capacity to a grossly unfair degree to Plaintiff's financial detriment.

54.     Defendants also violated the DTPA for failing to comply with Texas Business and Commerce Code, Sections 302.101, 302.105, 302.151(11)-(16), 302.152, and 302.153(a).

**COUNT VIII**
**CONSPIRACY**

55.     The preceding factual statements and allegations are incorporated herein by reference.

56.     Defendants (and possibly others), either working together as a combined group or in sub-combinations of two or more, affirmatively conspired to engage in the wrongful actions set forth

above.  By doing so, Defendants conspired to accomplish an unlawful purpose or a lawful purposed by an unlawful means.  As such, Defendants conspired to commit the wrongful actions outlined in Counts I-IV, above, all of which directly and proximately caused Plaintiff to sustain actual and consequential damages.  Defendants' wrongful actions constitute civil conspiracy at Texas common law.

**COUNT IX**
**MONEY HAD AND RECEIVED**

**57.**     The preceding factual statements and allegations are incorporated by reference.

**58.**      By their above-described wrongful actions and/or inaction, Defendants hold money obtained by a) the wrongfully charged and collected purchase prices paid by Hatch for the grossly overvalued coins misrepresented and sold to him by Defendants; and b) coins impermissibly sold to third parties and the funds retained without payment to Hatch or replacement of his coins, that, in equity and good conscience, belongs to Hatch.  Defendants, therefore, should be compelled to refund such wrongfully charged and collected funds under the equitable doctrine of money had and received.

**COUNT X**
**UNJUST ENRICHMENT**

**59.**     The preceding factual statements and allegations are incorporated herein by reference.

**60.**     Defendants (and possibly other persons and entities, including Defendants'. employees) have been unjustly enriched by (i) being paid an excessive value for coins that are not supported by any reasonable valuation; (ii) using the fraudulently obtained revenues and profits paid by Hatch, and (iii) generating a return on the amounts described in (i) and (ii).  Accordingly, Hatch seeks to impose a constructive trust over (and recover) all amounts by which Defendants (and

possibly other persons and entities, including Defendants' employees) have been unjustly enriched.

## ALTER-EGO

61.    Based upon information and belief, Turner M. Jones ("Jones"), Melida Ramirez ("Ramirez"), and Lawrence Kuykendall ("Kuykendall"), individually and collectively, use various corporate forms as alter-egos and as mere tools or business conduits to shield assets and thus cause a diminution of available resources from which Hatch may obtain satisfaction of the damages directly and/or proximately caused by Defendants' wrongful conduct.  All of these entities operate, directly or indirectly, under the same roof.  These entities shared employees, corporate leadership and were undercapitalized as they routinely sweep profits from the operations of NCBR.  Upon information and belief, there are undocumented funds transfers between the corporations and/or partnerships.  Upon information and belief, there is an unclear allocation of profit and losses between these entities.   In short, the respective entities are substantially one and the same with Jones, Ramirez, and Kuykendall; and, the relationship between them is an illegitimate use of corporate form:

## RESPONDEAT SUPERIOR

62.    The preceding factual statements and allegations are incorporated herein by reference.

63.    Defendants also are liable for the above wrongful acts committed by their employees during the course and scope their employment by the Defendants; to wit, the employees' wrongful conduct was committed (i) within their general authority, (ii) in furtherance of Defendants' business, and (iii) to accomplish the objective for which the employees were hired (*i.e.*, selling overvalued coins to customers like Plaintiff)—all of which directly and/or proximately caused

Plaintiff to suffer damages to the financial benefit of Defendants—under the doctrine of *respondeat superior.*

## **RELIEF REQUESTED**

**64.**     The preceding factual statements and allegations are incorporated herein by reference.

**65.**     **RESCISSION.**   Based on Defendants' above wrongful conduct, Plaintiff is entitled to rescission of the transaction(s) pursuant to which Defendants fraudulently sold these coins to Plaintiff in the amount of Two Hundred Twenty-One Thousand Three Hundred Fifty-Six and 00/100 Dollars ($221,356.00).

**66.**     **ACTUAL AND CONSEQUENTIAL DAMAGES.**   In the alternative, and as direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered (and continues to suffer) damages in the form of, *inter alia*, the amounts paid to Defendants for the gold coins in excess of their value.   In any event, Plaintiff is entitled to recover consequential damages related to the funds he borrowed to purchase the coins and the mental anguish he has suffered in connection with these transactions—in an amount to be determined by the trier of fact.   All conditions precedent to Plaintiff's claims for relief have been performed and/or occurred.

**67.**     **PUNITIVE DAMAGES.**   Defendants' wrongful actions (and failure to disclose such wrongful actions) were committed intentionally, willfully, with malice and/or with conscious and/or reckless disregard for Plaintiff's rights and interests.   Accordingly, Plaintiff also is entitled to an award of punitive damages against Defendants, both as punishment and to discourage such wrongful conduct in the future.   Punitive damages are not capped or limited because Defendants' wrongful conduct constitutes a felony under Section 32.46 and Chapter 31 of the Texas Penal Code. *See* Section 41.008(c) of the Texas Civil Practice and Remedies Code.   All conditions precedent to Plaintiff's claim for relief have been performed and/or occurred.

24

68.   **TREBLE DAMAGES.**  Plaintiff also is entitled to treble damages for Defendants' knowing, willful and intentional wrongful conduct in violation of the RICO statute and the Texas DTPA, under 18 U.S.C. § 1964 (c) and Section 17.50(b)(1) of the TEXAS BUSINESS AND COMMERCE CODE.  All conditions precedent to Plaintiff's claims for relief have been performed and/or occurred.

69.   **ATTORNEYS' FEES, LITIGATION EXPENSES AND COSTS.**  Plaintiff also is entitled to recover his reasonable and necessary attorneys' fees, litigation expenses and court costs in prosecuting this action pursuant to, *inter alia*, Chapter 38 and/or Chapter 42 of the Texas Civil Practice and Remedies Code and/or Section 17.50(d) of the Texas Business and Commerce Code.

**WHEREFORE,** Plaintiff requests that upon final trial or hearing, judgment be awarded against the Defendants, jointly and severally for:

A.   With respect to Counts I-III (violations of 18 U.S.C. § 1961, *et seq.*)—

   (1)   threefold the actual damages sustained by Hatch with costs of suit, attorneys' fees, litigation expenses and court costs, all under 18 U.S.C. § 1964(c), with pre- and post-judgment interest at the highest legal rates; and

   (2)   quitable relief, as may be appropriate, under 18 U.S.C. § 1964(a), including an equitable accounting for all benefits, consideration and profits received, directly or indirectly, including imposing a constructive trust, the voiding of unlawful transfers, and the disgorgement of all ill-gotten gains and profits.

B.   With respect to Counts IV-IX:

   (1)   rescission;

   (2)   actual damages to be determined by the trier of fact;

   (3)   punitive damages;

   (4)   treble damages;

(5)    all amounts by which Defendants have been unjustly enriched;

(6)    an equitable accounting for all benefits, consideration and profits received, directly or indirectly, by Defendants, including imposing a constructive trust, the voiding of unlawful transfers, and the disgorgement of all ill-gotten gains and profits;

(7)    pre- and post-judgment interest at the highest legal rates;

(8)    investigative costs, deposition expenses, witness fees;

(9)    attorneys' fees and litigation expenses incurred through the trial and any appeals of this case;

(10)   costs of suit; and

(11)   such other and further relief that the Court deems just and proper.


## JURY DEMAND

Plaintiff respectfully demands a trial by jury on all of his claims and causes of action so triable.

Respectfully submitted,

**STEVENS BALDO & LIGHTY, PLLC**
550 Fannin Street, Suite 700
Beaumont, TX 77701
(409) 835-5200
(409) 838-5638(f)


By: */s/ R. Lyn Stevens*_____
       R. Lyn Stevens
       State Bar No. 19189020
       Southern District Bar No. 3711

       **ATTORNEYS FOR PLAINTIFF,
       JOHN L. HATCH**